UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THERESE ROHLING PLATT,

Plaintiff,

v.

HOLLAND AMERICA LINE INC., ET AL.,

Defendants.

CASE NO. 2:20-cv-00062-JHC

ORDER RE: MOTION FOR PARTIAL SUMMARY JUDGMENT

Before the Court is Defendants' motion for partial summary judgment (Dkt. # 50) and Defendants' motion to strike Dr. Pliskin's report (incorporated in Defendants' reply brief) (Dkt. # 81 at 1–6). The Court noted the summary judgment motion for next month (*see generally* Dkt.), but the parties have fully briefed it, and the Court may now rule on it.

For the reasons below, the Court:

(1) DENIES the motion for partial summary judgment; and

(2) GRANTS in part and DENIES in part the motion to strike.

# I

## BACKGROUND

A. Factual History

In April 2019, Platt and her husband boarded a Caribbean cruise on the ZUIDERDAM, a ship operated by Defendants. *See generally* Dkt. ## 50 at 2–6, 76 at 5–18. On April 11, 2019, Platt disembarked to attend a barbeque on a small private island called "Half Moon Cay." On the island, there were various food and drink stations for the guests to enjoy. Platt tried to pour herself some guava juice from a juice machine. *Id.* She then felt a shock run through her body. *Id.* As Platt stated in her post-incident report:

> My husband decided to take a pre-filled cup of water but I saw that one of the machines that dispenses drinks had a guava flavoured juice. I decided to have the guava. I selected a cup situated to the left of the machine on a platform. As I moved towards the machine[,] I immediately felt a sensation which I would describe as an electric shock. I screamed and fell back onto the ground where I felt pain in my arms and legs. The initial feeling was that the shock was rising from my feet and up my body. It was brief but caused me to cry out in pain and as I lay on the ground I found myself hyperventilating as a result of the shock.

Dkt. ## 50 at 2, 51-4 at 2.

Platt received medical treatment and evaluation while aboard the ship and for the duration of the cruise.[1] Immediately after the incident, Platt began to complain of numbness, pain in her limbs, anxiety, headaches, and dizziness. *See, e.g.*, Dkt. # 80 at 35, 48. Platt visited the ship's doctor multiple times during the remainder of the cruise. Dkt. ## 50 at 3; 76 at 5–6. She was also referred to a neurologist in Curaçao, "Dr. Prada C."[2] Dkt. # 80 at 30. Platt reported similar symptoms to Dr. Prada, who concluded that there was a "[p]ossible peripheral nerve injury after electric shock" and recommended neurological follow-up after the cruise. *Id.*

---

[1] A more comprehensive summary of Platt's post-incident medical treatment can be found in the parties' briefs. *See* Dkt. ## 50 at 2–6 (Holland's brief); 76 at 5–18 (Platt's brief).

[2] The medical record does not contain Dr. Prada's full name.

When Platt returned home, she began treatment with various medical providers. Platt saw her primary care physician, Dr. Christopher Choi. Platt reported to Dr. Choi that she continued to suffer from the symptoms that she experienced on board the cruise, including tingling, intermittent sharp pain, anxiety, and chest pain. *See, e.g.*, Dkt. # 80 at 57, 59, 61, 63. His "assessments" included "[n]europathic pain," "[l]umbrosacral radiculopathy," "and "[e]lectrocution." *Id.* at 59.

Dr. Choi referred Platt to neurologist Dr. Venkat Veerappan. *Id*. Platt began regular treatment with Dr. Veerappan. During her treatment, Platt reported symptoms including shooting pain in her feet, legs, arms, and hands, "pins and needles" sensation in her feet and hands, burning in her left hand, occasional chest pain, headaches, and fatigue. Dkt. # 51-15 at 2–4. Dr. Veerappan ordered several tests to assess Platt. Her electroencephalogram ("EEG") showed "bilateral spike and wave activity lasting 1-2 seconds at a time," which was "suggestive for epilepsy." Dkt. # 51-16 at 2. The report also suggested that "[c]linical correlation with CT/MRI scans, etc. is recommended." *Id.* But Platt's other testing—including her electromyography test("EMG"), nerve conduction studies, and MRI scans—all returned normal results. In a declaration attached to Platt's response brief, Dr. Veerappan stated that in his medical opinion, "it is more likely than not that the electrocution injury caused Mrs. Platt to suffer the following: (a) Focal seizure with experiential sensory symptoms[;] (b) Anxiety depression[;] (c) Epilepsy[;] (d) Paresthesia[;] (e) Cognitive disorder[;] (f) Short-term memory loss[;] (g) Electrocution, sequela[; and] (h) Sensory neuropathy[.]" Dkt. # 78 at 4.

Dr. Veerappan referred Platt to neuropsychologist Dr. Sharon Jung to "assess her cognitive functioning in the context of anxiety and seizures." Dkt. # 51-18 at 2. After attempting to administer a series of cognitive tests, Dr. Jung concluded that Platt "failed a performance validity test." *Id.* According to Dr. Jung, "[t]hese are extremely easy tests designed

to look difficult and track whether examinees are complying with test instructions to answer questions to the best of their ability. Failure on these tests is highly atypical even with individuals with severe neurologic dysfunction." *Id.* Because Platt failed the validity test, her "performances on other cognitive tasks could not be considered as valid indicators of her current level of cognitive functioning." *Id.* at 3. Notwithstanding this conclusion, Dr. Jung still concluded that "these findings do not disregard the possibility that [Platt] is experiencing significant cognitive and functional difficulties. In fact, her scores likely represent some combination of genuine cognitive impairment combined with fluctuating task engagement." *Id.* Dr. Jung stated that "based on the patient's history and temporal onset of symptoms, her cognitive concerns may be multifactorial including: 1) depression, anxiety, and PTSD from the electrical injury; 2) ongoing pain; 3) reduced sleep quality; 4) cognitive sequelae from electrical injury; 5) seizures; and/or 6) medications (i.e., Lamictai, Ativan)." *Id.* She also concluded that "[h]er endorsement on a self-report questionnaire of symptoms of PTSD related to her electrical injury was clinically significant." *Id.*

At the direction of her attorneys, Platt underwent evaluation by retained expert Dr. Neil H. Pliskin, a neuropsychologist and professor of clinical psychology at the University of Illinois College of Medicine. Dkt. # 51-21 at 2–13, 15. Dr. Pliskin is an expert in the effects of electric shock on patients. *Id.* Dr. Pliskin administered tests and conducted an examination to assess Platt's neurocognitive functioning. *Id.* at 4–5. Dr. Pliskin concluded that the results of these tests "broadly reflect neurocognitive abilities at expectation for her age with the exception of a circumscribed deficit in select higher-level executive functioning abilities. While this focal pattern of deficits is an uncommon presentation in individuals who have experienced an electrical shock injury, her profile of isolated executive functioning deficits may be related to the evidence of abnormal activity in the frontal lobes on EEG." *Id.* at 6. Dr. Pliskin stated that Platt

may suffer from post-traumatic stress syndrome (PTSD), but also opined that it was "unclear to what extent [her neurocognitive symptoms were] directly relatable to her electrical shock injury." *Id.* at 12.  In a follow-up letter in 2023, Dr. Pliskin stated that Platt's "overall *neurocognitive* profile is inconsistent with that typically observed in electrical injury.  However, the psychological changes that she has experienced including emotion regulation changes and posttraumatic stress disorder are consistent with the scientific literature following electrical injury."  Dkt. # 79 at 32.

In October and November 2022, Platt was hospitalized following a series of seizure episodes.  An extended, 24-hour EEG recording indicated "abnormal" results that were "consistent with history of seizure disorder with semiology that can be suggestive of temporal lobe or frontal lobe epilepsy."  Dkt. # 80 at 131.  Because of the severity of her seizures, Dr. Jimmy Novorro opined that Platt was "not considered to be safe for discharge," and recommended that Platt be transferred to another facility for further monitoring.  *Id.* at 142.  She was then treated by Dr. Samir S. Bangalore, a specialist in seizures.  Dr. Bangalore concluded that the seizures were not "electrographic" and that she did not exhibit "epileptiform abnormalities to suggest epilepsy."  *Id.* at 152.  Dr. Bangalore concluded that "[in] all likelihood, her seizures are due to underlying psychiatric disturbance, not an active neurologic issue."  He diagnosed her with "psychogenic nonepileptic seizures."  *Id.*

B.  Procedural History

Platt brought this action in January 2020.  Dkt. # 1.  She alleged that Holland America Line – USA, Holland America Line NV LLC, and HAL Antillen NV (collectively, "Holland") negligently maintained the electrical system of the juice machine by failing to inspect, maintain, and repair the machine and by failing to take steps to prevent the incident.  *Id.* at 4.  The complaint asserts that Holland's negligence caused Platt's injuries and that as a result, she suffers

from, among other things, tingling/pain in her extremities, nerve damage, seizures, short-term memory loss, headaches, and various psychological and cognitive conditions. *See, e.g.*, *id.* at 4.

Holland now moves for partial summary judgment. Dkt. # 50. Holland does not dispute that the juice machine shocked Platt, or that Holland negligently maintained the juice machine and associated electrical system. Holland has already stipulated to those elements of Platt's case. *See* Dkt. # 18 (order accepting Holland's stipulation of negligence). Instead, Holland's motion disputes only whether the shock *caused* the host of injuries from which Platt says she now suffers. In its reply brief, Holland also moves to strike a report authored by Dr. Pliskin. *See* Dkt. # 81 at 1–6.

## II

## MOTION TO STRIKE

In its reply brief (Dkt. # 81 at 1–6), Holland moves to strike the "Third Report" of Dr. Pliskin, which Platt attaches to a declaration in support of her response brief. *See* Dkt. # 71 at 31–34 (Dr. Pliskin's report). Holland makes two arguments in support of its motion to strike. First, Holland argues that Platt's counsel impermissibly provided Dr. Pliskin with confidential mediation materials. Second, Holland argues that the report is untimely.

The Court GRANTS the motion in part and DENIES the motion in part.

### A. Disclosure of Confidential Mediation Materials

Holland first argues that the Court should strike the report because Dr. Pliskin relied on confidential mediation materials. Dr. Pliskin's report states that he reviewed, among other things, "a mediation letter" between the parties. Dkt. # 79 at 31. The report also includes a brief quotation from the mediation letter. *Id.* ("Moreover, in the mediation letter, this conclusion is further minimized to say that the impairment on "two tests of mental flexibility . . . . are incidental." (alteration in original)).

This disclosure violated Local Civil Rule 39.1(a)(6), which states that all mediation or settlement materials "shall, in all respects, be confidential," and "shall not be . . . disclosed to anyone not a party to the litigation." Platt's counsel's disregard of the local rules is frustrating. While the Court could strike the entire report based on counsel's conduct, the Court believes that such medicine would be too strong. The passage quoting from the mediation letter appears rather insignificant to Dr. Pliskin's ultimate causation and diagnostic conclusions. Accordingly, the Court only strikes the reference to the mediation letter. Dr. Pliskin shall not provide any opinions at trial based on the mediation letter he reviewed.

B. Untimeliness of the Report

Holland next argues that the Court should strike the report because it is untimely under the Court's scheduling order and Federal Rule of Civil Procedure 26.

Dr. Pliskin is a retained expert subject to the reporting requirements of Federal Rule of Civil Procedure 26(a)(2)(B). The Court's scheduling order required the parties to disclose their expert reports by January 6, 2022, and to disclose rebuttal expert reports by February 7, 2022. Dkt. # 31. Dr. Pliskin's report was disclosed on January 26, 2023. Dr. Plisken's report is thus presumptively untimely—Dr. Pliskin is entitled only to provide new opinions beyond those contained in his initial report if the report constitutes a "supplemental" report under Federal Rule of Civil Procedure Rule 26(e).

"In determining whether a supplement under Rule 26(e) is appropriate, the court considers (1) whether the supplemental information correspond[s] to a prior Rule 26(a) disclosure and, if so, (2) whether the supplemental information [was] available at the time set for the initial disclosure." *Ibekwe v. White*, 2016 WL 6963051, at *4 (C.D. Cal. Feb. 23, 2016) (citation and quotation marks omitted). "Supplementing an expert report pursuant to Rule 26(e) means correcting inaccuracies or filling the interstices of an incomplete report based on

information that was not available at the time of the initial disclosure." *Sherwin–Williams Co. v. JB Collision Servs., Inc.*, 2015 WL 1119406, at *6 (S.D. Cal. Mar. 11, 2015) (citation and quotation marks omitted). "[S]upplementation does not cover failures of omission because the expert did an inadequate or incomplete preparation[.] To construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would wreak havoc in docket control and amount to unlimited expert opinion preparation." *Id*.

The Court finds that some passages cannot be justified as "supplementation," and thus strikes those portions of the report. The Court strikes any passage that seeks to rebut opinions offered by Dr. Rhoads (one of Holland's experts). If Dr. Pliskin wanted to rebut the opinions offered by Dr. Rhoads, he needed to do so no later than 30 days after Dr. Rhoads's reports were issued (that is, in roughly February or March 2022) or by the deadline provided by the Court.

But some portions of the report constitute genuine supplementation and will be permitted. For example, Dr. Pliskin's opinions about psychogenic non-epileptic seizures (PNES) only became relevant following Platt's most recent seizure episodes in late 2022, when a doctor diagnosed her for the first time with PNES. And Dr. Pliskin's clarification of the "misunderstanding" of his prior opinions are justified, as it largely reiterates opinions offered in his original report.

## III

## Motion for Partial Summary Judgment

### A. Legal Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Galen v. Cty. of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). When evaluating a motion for summary judgment, a court must view the facts in the light most favorable to the non-moving party.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017). A court's role on summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248–49).

B.     Causation

An essential element of any negligence claim is causation. *See Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1070 (9th Cir. 2001); *Samuels v. Holland Am. Line–USA Inc.*, 656 F.3d 948, 953 (9th Cir. 2011). To recover for a given injury, a plaintiff must prove that the injury was *caused* by the negligent act. *Morris*, 236 F.3d at 1070. "Where recovery is sought for physical injuries allegedly caused by a defendant's wrongful act, the plaintiff must produce evidence to establish, with reasonable certainty, a causal relationship between the injury and the subsequent condition, so that the jury will not be indulging in speculation and conjecture in passing upon the issue." *Ely v. Dick*, No. 2:13-CV-2185-RSM, 2015 WL 1965263, at *3 (W.D. Wash. Apr. 30, 2015) (citation and quotation marks omitted). A plaintiff will often prove this causal relationship through medical testimony. "Medical testimony used to show causation must be sufficient to establish that the injury-producing situation 'probably' or 'more likely than not' caused the subsequent condition, rather than that the accident or injury 'might have,' 'could have,' or 'possibly did' cause the subsequent condition." *Hausman v. Holland Am. Line-USA*, No. 13CV00937 BJR, 2015 WL 9839747, at *1 (W.D. Wash. Aug. 21, 2015) (quoting *Ely*, 2015 WL 1965263, at *3).

Causation is typically a question of fact to be resolved by a jury. *See Wyler v. Holland Am. Line-USA, Inc.*, 348 F. Supp. 2d 1206, 1209 (W.D. Wash. 2003) ("In negligence cases, questions concerning foreseeability and causation particularly lend themselves to decision by a jury."); *Steinle v. United States*, 17 F.4th 819, 822 (9th Cir. 2021) ("[C]ausation often presents a question of fact for the jury."); *Creel v. Loy*, 524 F. Supp. 3d 1090, 1094 (D. Mont. 2021) ("[N]egligence actions usually involve questions of fact regarding breach of a duty and causation; as a result, they are not ordinarily susceptible to summary judgment and are usually better resolved at trial." (citation omitted)); *Vickers v. United States*, 228 F.3d 944, 953 (9th Cir. 2000) ("[T]he basic causation-related issues involve questions of fact, unless reasonable [persons] will not dispute the absence of causality." (citation and quotation marks omitted) (alterations in original)). But while "causation often presents a question of fact for the jury, where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact." *Steinle*, 17 F. 4th at 822; *see also Beard v. Mighty Lift, Inc.*, 224 F. Supp. 3d 1131, 1136 (W.D. Wash. 2016) (Although "proximate cause is ordinarily a jury question, . . . the court may determine proximate cause on summary judgment if reasonable minds could reach only one conclusion.").

Holland argues that Platt fails to establish that the medical conditions from which she suffers were caused by the electric-shock incident. *See generally* Dkt. # 50. The Court concludes that, perhaps by the slimmest of margins, Plaintiff has demonstrated a genuine dispute of material fact as to causation.

Platt's treating physicians and experts opined that her injuries were caused by the incident. In a declaration attached to Platt's response brief, Dr. Veerappan stated that in his medical opinion, "it is more likely than not that the electrocution injury caused Mrs. Platt to suffer the following: (a) Focal seizure with experiential sensory symptoms[;] (b) Anxiety

depression[;] (c) Epilepsy[;] (d) Paresthesia[;] (e) Cognitive disorder[;] (f) Short-term memory loss[;] (g) Electrocution, sequela[; and] (h) Sensory neuropathy[.]" Dkt. # 78 at 4. Dr. Veerappan explained the basis for this conclusion:

> The basis for my medical causation opinion not only is based on what I have been seeing over the last three years [and] also Mrs. Platt's irregular EEG repeats and Mrs. Platt's presentation in all her visits. In other words, the objective tests correlate with her symptoms and mechanism of electrocution injury. In part, my medical causation opinions are also reliably based on a differential diagnosis, meaning that I have analyzed Mrs. Platt's symptoms and conducted tests to rule out other possible alternative causes.

*Id.* at 3–4.

Dr. Veerappan's declaration tracks his deposition testimony. For example, Dr. Veerappan explained during his deposition that it is "more likely than not" that Platt suffers from a partial seizure disorder based on Platt's "irregular EEG repeats," her in-office presentation, and "what [Dr. Veerappan has] seen over the last three years." Dkt. # 68 at 31. Dr. Veerappan made this diagnosis in part because "[t]here was no other insulting incident that [he] knew of, other than that episode. And electrocution has been known to cause seizures." *Id*. "If you look into any electrocution injuries," Dr. Veerappan said, "there are multiple symptoms that may happen from then on, even if it is a low grade electrocution or a moderate electrocution." *Id.* This includes "seizures, you can get memory issues, you can [get] attention deficits, focal issues, depression, anxiety." *Id*. Dr. Veerappan also explained that while Platt's reports of pain and numbness in her extremities could not be confirmed through objective testing, "numbness and tingling[] do[] not always present" in such testing, so "you can have neuropathy without [positive] findings on the . . . nerve conduction studies." *Id.* at 35.

While Platt's other medical records are sparse on causation opinions, several providers give limited evidence from which a jury could infer causation. Dr. Pliskin appears to believe that Platt suffers from some form of psychological injury resulting from the incident. In his 2021

report, Dr. Pliskin was asked whether Platt suffers from "emotional distress . . . because of the incident." Dkt. # 51-21 at 13. He responded that "[o]bjective evaluation of Ms. Platt's emotional distress indicates she exhibits symptoms of traumatic stress."[3] *Id.* And in a 2023 letter, Dr. Pliskin noted that "the psychological changes that [Platt] has experienced including emotion regulation changes and posttraumatic stress disorder are consistent with the scientific literature following electrical injury." Dkt. # 79 at 32. Dr. Pliskin also observed that "it is noteworthy that Ms. Platt has no reported psychiatric or trauma history prior to her electrical shock experience." *Id.*; *see also id.* (concluding that Platt's "clinical picture" is "affected by postrraumatic stress and sensory/pain issues"). Though not a model of clarity, Dr. Pliskin's statements imply a causal link between the incident and Platt's symptoms based on the temporal connection between the two. Additionally, while Dr. Jung deemed Platt's neurocognitive testing inconclusive because Platt failed the "validity" portion of the tests, Dr. Jung still opined that Platt's "cognitive difficulties could be secondary to the sequelae of electrocution or seizures or the effects of her AED medication." Dkt. # 51-18 at 3. Finally, Dr. Choi opined that Platt "has been suffering from situational anxiety as a result of the electric shock event." Dkt. # 80 at 74.

Platt's experts relied in part on the temporal connection between the incident and the onset of symptoms to reach their conclusions about causation. *See, e.g.*, Dkt. # 68 at 36 (Dr. Veerappan concluding that it "is [his] opinion that there is a temporal relationship" between the seizures and the incident); Dkt. # 51-18 at 3 (Dr. Jung drawing conclusions "based on the patient's history and temporal onset of symptoms"); Dkt. # 79 at 32 (Dr. Pliskin observing that "it is noteworthy that Ms. Platt has no reported psychiatric or trauma history prior to her electrical shock experience."). While a temporal relationship often will not on its own suffice to

[3] But elsewhere in his report, Dr. Pliskin opined that it is "unclear to what extent [her neuropsychological injuries were] directly relatable to her electrical shock injury." Dkt. # 51-21 at 12.

show causation, in this case, Platt's experts (and a reasonable jury) could rely, at least in part, on the temporal relationship between the incident and the onset of symptoms to reach an inference of causation.

Platt did not suffer from her current symptoms before the incident. For example, there is no sign that Platt suffered from chronic pain or numbness in her extremities or from any seizure-related symptoms before the incident. *See, e.g.*, Dkt. # 68 at 44 ("No seizures as an adult until the electrocution"; "No cognitive issues prior to the electrocution"). But in the immediate aftermath of the incident, Platt began reporting a host of new symptoms. Less than 24 hours after the incident, Platt described feeling "tingling in her left foot and left hand," "some tingling sensation on both hands," and "headaches and dizziness." Dkt. # 80 at 48; *see also id.* at 35 (doctor describing Platt's statements of "intermittent shooting pains" in her lower extremities). A few days later, Dr. Prada observed that Platt "present[ed] after electric shock (voltage unknown)," showed "sensory disturbances in the legs and arms (distally) with fatigue and mild dizziness" and "[o]n examination[,] patches of dysesthesias in the left hemibody." Dkt. # 80 at 30. Platt also reported that her cognition issues "started within weeks of the incident in April 2019." Dkt. # 68 at 33. Platt consistently complained of these and other symptoms to her providers in the months that followed. Similarly, Dr. Veerappan relied on the "temporal connection" between the incident and the onset of her seizure-related symptoms to diagnose Platt with partial seizure disorder. Dkt. # 68 at 35; *see also id.* at 36 ("[M]y opinion [is] that there is a temporal relationship to the two," leading to a conclusion that the "electrocution resulted in the partial seizure disorder.").

Viewing the facts and reasonable inferences therefrom in the light most favorable to Platt, Platt's experts (and a reasonable jury) could conclude that the timing of the onset of symptoms suggests that the incident caused at least some of her symptoms. As the Ninth Circuit has

explained, "[w]hile the mere fact that two events correspond in time and space does not *necessarily* mean they are causally related, 'a temporal relationship between exposure to a substance and the onset of a disease . . . can provide compelling evidence of causation.'" *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1059 (9th Cir. 2003) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999)).

When the temporal proximity of the injury and the onset of symptoms is so immediate (here, less than a day for some symptoms) and the type of injury is so acute, the inference of causation becomes substantially more reasonable. *See West v. Bayer HealthCare Pharms. Inc.*, 293 F. Supp. 3d 82, 95 (D.D.C. 2018) ("The doctors' reliance on temporal proximity as one of a constellation of factors they considered when determining causation in this particular case is especially appropriate, given the *extremely* close proximity between the time Plaintiff West used the potentially contaminated Triad alcohol prep pad and the onset of his infection."); *Paeschke v. Gen. Motors LLC*, No. 4:16-CV-5050-LRS, 2017 WL 5632442, at *6 (E.D. Wash. Oct. 11, 2017) ("[W]here there is a sudden or immediate onset of symptoms, non-expert evidence in combination with expert testimony suggesting a possible cause is sufficient for a jury to infer causation without engaging in speculation."); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 158 (3d Cir. 1999) ("[W]hen the temporal relationship is strong and is part of a standard differential diagnosis, it would fulfill many of the *Daubert*[ ] factors."); *cf. Porter v. United States*, No. 216CV00633APGDJA, 2020 WL 8261603, at *2 (D. Nev. Nov. 12, 2020) (observing that detailed expert testimony becomes less useful when "the connection is a kind that would be obvious to laymen, such as a broken leg from being struck by an automobile" (citation and quotation marks omitted)). Holland points to no other causal explanation for the sudden onset of Platt's symptoms, rendering an inference based in part on temporal relationship more plausible. *See Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1198 (9th Cir. 2014) ("Given the

difficulties in establishing a medical cause and effect relationship, '[c]ausation can be proved even when we don't know precisely how the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage somehow.'" (quoting *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998))).

To be sure, a jury could disbelieve Platt's reporting of her symptoms based on the shaky evidence of her conditions. For example, Dr. Veerappan stated that there was "no physical explanation for the symptoms in [Platt's] arms and legs" based on his testing, Dkt. # 68 at 30, and Dr. Murphy (Holland's expert) opined that "there is currently no objective evidence of incident-related nerve injury," Dkt. # 51-25 at 34. As to Platt's cognitive impairments, Dr. Jung concluded that Platt failed the "validity" portion of the neurocognitive testing. Dkt. # 51-18 at 2–3.[4] This is suggestive of malingering and intentional misrepresentation of symptoms, a conclusion which the jury could reasonably extend to other categories of symptoms. Further, Dr. Pliskin concluded that "[t]here is no evidence to suggest that Ms. Platt has sustained a memory disorder as a result of her electrical shock injury," and that her "pattern of [cognitive] deficits is an uncommon presentation in individuals who have experienced an electrical shock injury." Dkt. # 51-21 at 6. And most of Platt's experts based their conclusions in large part on Platt's

---

[4] Dr. Jung stated:

> Ms. Rohling Platt failed a performance validity test. These are extremely easy tests designed to look difficult and track whether examinees are complying with test instructions to answer questions to the best of their ability. Failure on these tests is highly atypical even with individuals with severe neurologic dysfunction including individuals with dementia. Further, her level of performance on this task is inconsistent with her reported day-to-day functioning (e.g., patient would not be able to drive if this were her true cognitive functioning). As such, her performances on other cognitive tasks could not be considered as valid indicators of her current level of cognitive functioning.).

Dkt. # 51-18 at 2–3. But Dr. Pliskin came to a different conclusion during his examination and said that "[o]verall, she is considered a credible reporter of her clinical symptoms and her self report is valid for clinical interpretation." Dkt. # 51-21 at 5.

self-reported symptoms, providing extremely limited objective evidence of impairment. But these concerns go largely to the extent of Platt's symptoms, not causation. If a jury finds that Platt does, in fact, suffer from the symptoms she reports, a reasonable jury could infer a causal link between the symptoms reported and the incident.

Moreover, a jury could discount the opinions of Platt's experts as insufficiently supported post hoc rationalizations. For example, a jury may not trust Dr. Veerappan's partial-seizure diagnosis: The disorder was never corroborated by other objective testing like a CT scan or MRI, the EEG testing contained numerous "artifacts" that limited the accuracy of the testing, and Dr. Bangalore, a specialist in seizures, concluded that "[in] all likelihood, her seizures are due to underlying psychiatric disturbance, not an active neurologic issue." Dkt. # 80 at 152. The other diagnosis and causation opinions contained in Dr. Veerappan's declaration are rather conclusory, too. A jury might very well question how Dr. Veerappan reached these conclusions.[5] And several of Platt's other experts are vague as to their opinions of causation and diagnosis.

Notwithstanding these issues, the Court still concludes that questions of fact preclude summary judgment. Platt's medical providers are well-credentialed experts in their fields. They

---

[5] Holland argues in its reply brief that Dr. Veerappan's declaration is too conclusory to create a material dispute of fact. The Court agrees that Dr. Veerappan's declaration is lacking in detail. *See Clausen*, 339 F.3d at 1058 (generally requiring an expert to explain why they are discounting plausible alternative explanations for the injury). But the Ninth Circuit has also explained that "[m]edicine partakes of art as well as science." *Messick*, 747 F.3d at 1198. The Ninth Circuit has approved of a doctor's reliance on "extensive clinical experience" as well as the patient's "records, treatment, and history" to arrive at a causation opinion. *Id.* Dr. Veerappan's declaration and accompanying testimony explain that his diagnoses and causation opinions are based on several years of treatment and his knowledge of the scientific literature. He opined—under penalty of perjury—that Platt's symptoms were probably caused by the electric shock incident. The Court is not prepared to disregard these conclusions as a matter of law. Instead, the Court finds that the validity (or lack thereof) of Dr. Veerappan's conclusions should be tested at trial before a jury.

Further, consistent with the Court's order on Holland's evidentiary motion, Dr. Veerappan's testimony at trial must be cabined to those opinions developed *during* the course of treatment. To the extent that Dr. Veerappan developed any of his opinions *after* treatment or specifically for the purpose of litigation, those opinions will be barred.

have expressed opinions—to varying degrees of specificity—that Platt's symptoms were caused by the incident. This creates a genuine issue of fact suitable for resolution by a jury. *See In re Roundup Prod. Liab. Litig.*, 358 F. Supp. 3d 956, 960 (N.D. Cal. 2019) ("It is sufficient for a qualified expert, in reliance on his clinical experience, review of a plaintiffs' medical records, and evaluation of the general causation evidence, to conclude that an obvious and known risk factor[ ] is the cause of that plaintiff's disease." (citation and quotation marks omitted)).

At trial, Platt's experts will be required to provide their causation opinions under oath. Their methodologies and opinions may be rigorously tested through cross-examination. And if necessary, Holland may impeach the experts using their prior statements, which, as noted, are sparse on contemporaneous causation opinions and objective indicia of Platt's impairments. A jury will then decide whether it is more likely than not that Platt suffers from the injuries from which she complains and whether her symptoms were caused by the incident. *Cf. Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."); *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017) ("Where, as here, two doctors who stand at or near the top of their field and have extensive clinical experience with the rare disease or class of disease at issue, are prepared to give expert opinions supporting causation," exclusion is not appropriate and "the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system.").

Causation is typically a question of fact. *See, e.g.*, *Beard*, 224 F. Supp. 3d at 1136; *Wyler*, 348 F. Supp. 2d at 1209. By perhaps the narrowest of margins, the Court concludes that causation should be determined by a jury at trial, not by a judge at summary judgment.

C. Lost Wages

As a final matter, Holland seeks a partial summary judgment that Platt is not entitled to lost wages stemming from her injuries. Dkt. # 50 at 18–19. According to Holland, Platt was a stay-at-home parent at the time of the incident but claims that she had planned to return to work as a registered nurse at some unspecified time in the future. *Id.*

Holland's motion is predicated on the lack of a causal link between the incident and Platt's symptoms: Because Platt cannot prove that her symptoms stem from the incident, Holland says, Platt cannot recover for any theoretical wages lost as a result of those symptoms. But as described above, the Court concludes that causation is a question to be resolved by a jury. Holland provides no other argument to support its argument that Platt cannot recover for lost wages. So the Court denies Holland's request for partial summary judgment.

## IV

## CONCLUSION

For the reasons above, the Court:

(1) DENIES the motion for partial summary judgment; and

(2) GRANTS in part and DENIES in part the motion to strike.

Dated this 13th day of April, 2023.

John H. Chun
United States District Judge